UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KEHINDE TYRU  WOFFORD,

        Petitioner,

v.                                Case No. 10-12108
                                      Honorable Marianne O. Battani

LLOYD RAPELJE,

        Respondent.

_____/


**OPINION AND ORDER
DENYING THE HABEAS CORPUS PETITION,
DENYING A CERTIFICATE OF APPEALABILITY, BUT
GRANTING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

Petitioner Kehinde Tyru Wofford has filed a pro se habeas corpus petition

challenging his state court convictions for murder, assault with intent to commit murder,

armed robbery, kidnapping, and two firearm offenses.  He raises several constitutional

claims about the complaining witness's identification of him and the fairness of his trial.

Respondent Lloyd Rapelje urges the Court to deny the petition.  He argues that the

state court's adjudication of Petitioner's first six claims was objectively reasonable and

that Petitioner's seventh and final claim regarding the cumulative effect of errors is not

cognizable on habeas review.  Having reviewed the state court record, the Court agrees

with Respondent that Petitioner's claims do not warrant habeas corpus relief.  The

petition therefore will be denied.

# I. THE FACTS

Petitioner was charged with felony murder, premeditated murder,[1] assault with intent to commit murder, felon in possession of a firearm, possession of a firearm during the commission of a felony (felony firearm), kidnaping, and two counts of armed robbery.  The charges arose from an incident that occurred in Detroit on September 12, 2005, when five men robbed, assaulted, and kidnaped Quintin Tuggle and Daniel Burks. Burks incurred a minor gunshot wound when he managed to escape and run away, but Tuggle was fatally shot during the incident.  Petitioner was tried with co-defendant Gerald Hill, but before a separate jury, in Wayne County Circuit Court where a third co-defendant (Jovan Sly) testified against them.  As explained by the state court,

> Jovan Sly testified at trial that Wofford and Wofford's friend, Ace,[2] asked him to assist in a "lick," which is slang for a robbery.  Sly said that Wofford and Ace told him that they planned to rob a man named Dan (Burks), who supposedly had $300,000 to $500,000 in cash and twelve kilos of cocaine in his house.  They told him that Burks lived on Artesian Avenue on the West side of Detroit.  Sly said he knew Hill from prison and that he was close to Hill.  Sly said he knew Wofford as "Wolf" and knew Hill as "Slug."  Sly testified that the plan was to take Burks into his house, get the money and drugs, and then kill him.
>
> On September 12, 2005, Wofford picked Sly up.  Sly stated that when he got into Wofford's van, Wofford, Hill, Ace and a man he knew as "Que"[3] were already in the van.  The group then drove over to Artesian and Ace switched into a Dodge Durango parked down the street from

---

[1]  Although there was only one murder victim, the prosecutor's theory was that Petitioner was guilty of both premeditated murder and felony murder (murder committed during the commission of a felony).

[2]  Ace's real name was apparently Leroy Wilson.  Wilson was shot and killed by police officers in Kalamazoo before the trial at issue.

[3]  At trial, Que was also referred to as "Q".  It appears that, as of this trial, Que's real identity had not been determined.

2

Burks' house.  Sly said that the Durango was parked there from the night before.  Sly explained that Wofford told him that he (Wofford), Ace and Ace's brother had been "sitting" on Burks the day before, but could not go through with the robbery because there were too many people about.  Sly testified that they then followed Ace to a gas station to "grab a gas can," so they could "torch" the Durango after the robbery.  After this, they drove back to Artesian, parked the van in a getaway spot, got into the Durango and waited for Burks to arrive.

Sly said that Ace was the driver, Hill was in the front passenger seat, Que sat behind Ace, Wofford sat behind Hill, and he (Sly) sat in the third row.  Sly testified that, even though he was there to "back up" the robbery, he was not armed.  However, he indicated that Wofford, Hill, Ace and Que were all armed.  He said Wofford had an AK–47 assault rifle, Que had a .40 caliber handgun, and that Ace and Hill both had 9 mm handguns.  Sly said that, after waiting about 45 to 50 minutes, Burks returned home.  Sly said that Ace was the one who recognized Burks' truck.

Sly testified that, after Burks pulled into the driveway, Wofford ordered Hill and Ace to get out and grab him.  Sly said he saw Hill "post up" on the side of Burks' house and Ace "post up" on the opposite side.  At this point, Que "jumped in the driver's seat," Wofford got into the front passenger's seat, and Sly sat in the back row.  They then pulled off and drove past the house.  Sly said that, as they came back, "the guy was, it looked [like] he was pushing out his trash or something, and I seen him throw his hands up. . . ."

Daniel Burks testified that, on September 12, 2005, he was driving with his wife's uncle, Quintin Tuggle, in Tuggle's Chevrolet Tahoe.  Burks stated that Tuggle was driving and that they had just returned to Detroit from Flint.  Burks stated that Tuggle pulled into the driveway and asked Burks to get out and open the privacy gate, which he did.  Burks then pulled out the trashcan as Tuggle pulled up the rest of the way into the driveway.  Burks said that, after he pulled out the trash and began to cut across the grass back to the driveway, Hill came out from around the side of the house and pointed a gun at his head.  Burks testified that Hill ordered him to put his hands up and asked him "where is that work?"[4] Burks said he told Hill, "I don't have no work."  Burks stated that another man, who also had a gun, came from around the other house and Hill ordered him to "go get that guy in the back."  Burks testified that the other man, Ace, went up the driveway and ran into Tuggle, who was apparently

---

[4]  The term "work" is slang for drugs.

3

coming down the driveway.  At this point, Burks saw a black SUV pull up.

Sly testified that, as they pulled up, Wofford put his AK–47 out the window and ordered everybody into the truck.  Similarly, Burks testified that Wofford, who was pointing an AK–47 out of the window of the front passenger seat, threatened to kill them unless they got in the SUV.  Burks said the backseat passenger, who was also pointing a gun out of the window, pushed open the door.  At this point, Hill forced Burks and Tuggle into the backseat.  Burks said Hill followed Tuggle into the backseat and that the other man, Ace, ran off after Hill closed the door.  Sly also testified that Ace ran off after Burks and Tuggle were forced into the Durango.  Sly said that they then "pull[ed] off" and "bent a couple corners."

Burks' neighbor from across the street testified that she was on her porch when Burks arrived home.  She stated that right around the time when Burks pulled into his driveway, a black Durango pulled up and two men got out.  One man went to one side of Burks' house and then other went to the other side.  She stated that one of the men leaned on the house and waited and she saw the other on a cell phone, which she could see because of the lights on the phone.  The neighbor stated that the man on the north side of Burks' house came out and pointed a shiny gun at Burks, who had just pulled out a trashcan.  She said that Burks put his hands up and that he was soon surrounded by three men, who appeared to be trying to force him into the Durango.  The neighbor said she called 9–1–1 and told the operator to hurry and send someone to help Burks.  She also stated that, after the men got into the Durango, it pulled away.

Burks testified that, after they were forced into the Durango, Sly hit him with a gun and Hill began hitting Tuggle with a gun.  Burks testified that, after Tuggle stated that he did not know what this was about, Hill said, "you know, what this [is] about" and "we're going to kill you anyway."  Sly then began to go through Burks' pockets and took the $4,000 to $5,000 that Burks had.  Burks said that he had earlier asked Tuggle to hold $10,000 for him and that Hill took that money from Tuggle.[5]  Burks said Wofford turned around and pointed the AK–47 at them and said, "let's go," but Hill said "let's take him in the house."  Wofford then said, "just get in, let's go."  Burks said that Sly and Hill passed the money to the front, but wasn't sure if Wofford took it.  Burks indicated that, at this point, they were

---

[5]  Burks testified that he got the money as repayment of a loan and through the sale of a motorcycle.  However, Burks was apprehended several weeks after the events at issue with 4 kilograms of cocaine.  Burks testified that Tuggle had only come to stay with his niece (Burks' wife) in the past week as a result of some family trouble.  Burks stated that Tuggle was not involved in the drug business.

4

moving.

Sly testified that, after they pulled away, Wofford turned around and asked about the "money and dope" and told Burks and Tuggle, "I'm going to kill you niggers." Sly said that Wofford also ordered him to check Burks' pockets and that he found bundles of cash in rubber bands. Sly said he gave the money to Hill to put into a backpack they had brought. Sly said Burks said he had some "stacks" in his pocket, but "don't know nothing about no drugs—no five hundred thousand." Burks also said, "Just take the money—please don't kill me." At some point, Wofford took Hill's gun and pointed it at Tuggle's head and pulled the trigger, but it did not fire. Sly said that Wofford told Que to stop and the Durango slowed.

Burks testified that, after only a few blocks, the Durango pulled over and Wofford and Hill got out. Burks said they then pulled Tuggle out of the Durango and ordered him to the ground. Burks said he told Tuggle not to lie down because they were going to kill him. Sly testified that, after the Durango stopped, Wofford told Burks "I'm going to show you how to kill a nigger—and I'm going to kill you next," after which Wofford "pulled Quintin Tuggle out and laid him on the ground, stood over him at the top of him to the back of his head with the [AK–47], and the shot went off." Sly said he then pulled Burks out of the Durango. Burks testified that after he told Tuggle not to lie down, Sly pulled him out and held him; "And all I hear was pow. And when I heard the gunshot, I froze again." Burks admitted that he could not see who fired the shot, but said it sounded like the shot was from the AK–47.

Burks said that he then began to wrestle with Sly and got away. Sly testified that he let Burks get away because he's "not a killer." Burks testified that he started to run: "I'm running with my head down. Lord, I'm just hoping he don't shoot me in my head. So, I'm running and it just sound like a gun range behind me. I mean it's shots from everywhere. And I end up getting hit in my arm." Burks testified that he heard both handguns and an assault rifle firing. Sly testified that, after Burks got away, Wofford and Hill came around and began to fire at Burks. Sly stated that they fired too many shots to count.[6] Burks stated that he ran through some trees and a yard and made it to the next street. Burks said he knocked on a few doors and an old woman answered at one. He said he told her that "I think I've been shot and my uncle has been killed." At trial, that woman testified that she answered her door around midnight and

---

[6] Evidence and testimony established that more than 20 shots were fired. The shots were 7.62 mm and 9 mm in caliber and damaged several houses across from where Tuggle was found.

that she helped a young man who told her that he had been robbed and that the robbers had killed his uncle. She said she called the police and stayed with him until the police arrived. Burks said he soon heard a fire truck and saw smoke rising a few blocks away.

Sly testified that, after Burks got away, they all got into the Durango and returned to Wofford's van. Sly said Ace was waiting in the van and that Wofford told him to get rid of the Durango. Sly said he grabbed the gas can and doused the Durango while the others waited. He then lit one of his socks on fire and "burned the truck up." Sly said they then went to the home of one of Hill's relatives. There they divided the cash up equally. Sly said he got about $2300.

People v. Wofford, No. 278246, 2009 WL 1508882, at *1-4 (Mich. Ct. App. May 26, 2009) (unpublished) (footnotes in original).

Petitioner did not testify at trial. His defense was that he was with his girlfriend on the east side of Detroit when the crimes occurred and that the witnesses who implicated him in the crime were lying or mistaken.

## II. PROCEDURAL HISTORY

On January 26, 2007, the jury acquitted Petitioner of first-degree murder, but found him guilty of two counts of the lesser offense of second-degree murder, Mich. Comp. Laws § 750.317. The jury also found Petitioner guilty, as charged, of assault with intent to commit murder, Mich. Comp. Laws § 750.83, felon in possession of a firearm, Mich. Comp. Laws § 750.224f, felony firearm, Mich. Comp. Laws § 750.227b, two counts of armed robbery, Mich. Comp. Laws § 750.529, and one count of kidnaping, Mich. Comp. Laws § 750.349.

At the sentencing on February 15, 2007, the trial court dismissed one of the two murder convictions because the two convictions arose from the death of one individual. The court then sentenced Petitioner as a habitual offender to imprisonment as follows:

6

sixty to ninety years for the murder conviction; fifty to seventy-five years for the assault,

robbery, and kidnaping convictions; six to ten years for the felon-in-possession

conviction; and a consecutive term of two years for the felony firearm conviction.

Petitioner raised his habeas claims in an appeal of right.  The Michigan Court of

Appeals affirmed his convictions in an unpublished, per curiam opinion.  See Wofford,

2009 WL 1508882.  On October 26, 2009, the Michigan Supreme Court denied leave to

appeal because it was not persuaded to review the issues.  See People v. Wofford, 773

N.W.2d 685 (Mich. 2009) (table).

On May 25, 2010, Petitioner filed his habeas corpus petition in this Court

pursuant to 28 U.S.C. § 2254.  His claims are:

> I.     [He] was denied his due process right to a fair trial by the
>        erroneous admission of a tainted lineup identification by
>        complainant Daniel Burks which was preceded by a
>        custodial encounter between the two.
>
> II.    The prosecutor violated [his] due process rights by vouching
>        for co-defendant Sly's credibility through her [opening]
>        statement and elicitation of testimony that Sly was allowed to
>        plead guilty before trial in exchange for 'truthful testimony,'
>        and defense trial counsel was constitutionally ineffective in
>        failing to object.
>
> III.   [He] was denied a fair trial by the judge's comments in front
>        of the jury which demeaned the defense and belittled
>        defense counsel and denied [him] a fair trial.
>
> IV.    The prosecutor engaged in misconduct by eliciting testimony
>        suggesting [Petitioner's] involvement in other assaultive
>        crimes in violation of a court order, and the court abused its
>        discretion in denying a mistrial.
>
> V.     The trial court violated [his] due process rights by denying a
>        mistrial where the prosecutor repeatedly elicited improper
>        testimony designed to prejudice [him].

VI.     [He] was denied his state and federal constitutional rights to
        a fair trial by the trial judge, who permitted co-defendant Hill
        to testify in the presence of [Petitioner's] separate jury.

VI.     The cumulative effect of the errors in this case deprived
        [him] of his federal and state due process rights.

The Michigan Court of Appeals adjudicated these claims on the merits and concluded

that there were no errors warranting relief.

## III.  STANDARD OF REVIEW

"The statutory authority of federal courts to issue habeas corpus relief for

persons in state custody is provided by 28 U.S.C. § 2254, as amended by the

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)."  Harrington v. Richter,

__ U.S. __, __, 131 S. Ct. 770, 783 (2011).  Pursuant to § 2254, state prisoners are not

entitled to the writ of habeas corpus unless the state court's adjudication of their claims

on the merits

(1)     resulted in a decision that was contrary to, or involved an
        unreasonable application of, clearly established Federal law,
        as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable
        determination of the facts in light of the evidence presented
        in the State court proceeding.

28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ if
the state court arrives at a conclusion opposite to that reached by [the
Supreme] Court on a question of law or if the state court decides a case
differently than [the Supreme] Court has on a set of materially
indistinguishable facts.  Under the "unreasonable application" clause, a
federal habeas court may grant the writ if the state court identifies the
correct governing legal principle from [the Supreme] Court's decisions but
unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

8

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 131 S. Ct. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87.

## IV.  DISCUSSION

### A.  The Identification of Petitioner by the Complainant (habeas claim I)

Petitioner alleges that Daniel Burks' identification of him deprived him of due process and a fair trial because it was tainted by suggestive pretrial identification procedures. Burks identified Petitioner in a photo array on October 21, 2005, and in a live line-up on December 21, 2005. Petitioner claims that the photo array was suggestive because a police officer informed Burks before the showing of the photo array that the perpetrator was depicted in the array. Petitioner claims that the live line-up was suggestive because Burks saw him in the holding area of the state district court before the line-up.

### 1.  Clearly Established Federal Law

"The Constitution . . . protects a defendant against a conviction based on evidence of questionable reliability . . . ." Perry v. New Hampshire, __ U.S. __, __, 132

9

S. Ct. 716, 723  (2012).  "Most eyewitness identifications involve some element of

suggestion," id. at 727, but

> [a]n identification infected by improper police influence . . . is not
> automatically excluded.  Instead, the trial judge must screen the evidence
> for reliability pretrial.  If there is "a very substantial likelihood of irreparable
> misidentification," Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct.
> 967, 19 L.Ed.2d 1247 (1968), the judge must disallow presentation of the
> evidence at trial.  But if the indicia of reliability are strong enough to
> outweigh the corrupting effect of the police-arranged suggestive
> circumstances, the identification evidence ordinarily will be admitted, and
> the jury will ultimately determine its worth.

Id. at 720.  Courts in this Circuit follow

> a two part analysis.  The court first considers whether the procedure was
> unduly suggestive.  Wilson v. Mitchell, 250 F.3d 388, 397 (6th Cir. 2001);
> Ledbetter v. Edwards, 35 F.3d 1062, 1070-71 (6th Cir. 1994).  The court
> must decide if the procedure itself steered the witness to one suspect or
> another, independent of the witness's honest recollection.  Wilson, 250
> F.3d 397.  "The defendant bears the burden of proving this element."
> Ledbetter, 35 F.3d at 1071 (citation omitted).  If the procedure was
> suggestive, the court then determines whether, under the totality of the
> circumstances, the identification was nonetheless reliable and therefore
> admissible.  Wilson, 250 F.3d at 397 (citation omitted); Ledbetter, 35 F.3d
> at 1071.

Cornwell v. Bradshaw, 559 F.3d 398, 413 (6th Cir. 2009).  The following five factors

must be considered when determining whether an identification was reliable despite its

suggestiveness:  (1) the witness's opportunity to view the criminal at the time of the

crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior

description of the criminal; (4) the witness's level of certainty at the time of the

identification; and (5) the length of time between the crime and the identification.  Neil v.

Biggers, 409 U.S. 188, 199 (1972).


**2.  The Pretrial Identifications, Evidentiary Hearing, and State Court**

10

**Rulings**

The facts underlying Petitioner's challenge to Daniel Burks' identification of him

have been summarized as follows:

> Immediately after the robbery and shooting, Burks did not give a
> description specific to Wofford.  Indeed, Burks testified at trial that he was
> not cooperative with the police because he "wanted the individuals."
> However, following his arrest, investigators gave Burks a photo line-up
> and Burks readily identified Wofford as the man with the AK–47.  After this
> photo identification, Russell arranged for Burks to attend a line-up with
> Wofford in it before a preliminary examination scheduled for the same day.
> While awaiting the preliminary examination and line-up, Burks and Wofford
> were temporarily held in the same jail facility and saw each other.  Indeed,
> Burks testified at an evidentiary hearing that Wofford walked by and
> looked at him (Burks) while being escorted to his cell. However, the trial
> court postponed the line-up and preliminary examination.  Burks testified
> that, when Russell later escorted him to another jail later that same day,
> Wofford remarked "[t]hat's the guy they trying to get to testify against me."
> Burks said that he did not speak to Wofford or respond to Wofford's
> remarks.  Approximately two weeks after this encounter, Burks identified
> Wofford as the man with the AK–47 at the live line-up at issue.  Before his
> trial, Wofford's trial counsel moved to have Burks' photo and line-up
> identifications suppressed as unduly suggestive.  Wofford's trial counsel
> also moved to have the trial court exclude any in-court identification of
> Wofford by Burks.  The trial court held an evidentiary hearing to determine
> whether the identifications should be suppressed.
>
> At the conclusion of the hearing, the trial court found that the
> line-up identification was not impermissibly suggestive.  In addition, the
> trial court found that, given the totality of the circumstances, Burks had an
> independent basis for his identification.  For that reason, the trial court
> concluded that Burks would be able to make an in-court identification,
> even if the live line-up were impermissibly suggestive.

Wofford, 2009 WL 1508882, at *13-14.  The Michigan Court of Appeals agreed with the

trial court that the live line-up was not impermissibly suggestive and that there was an

independent basis for Burks' identification of Petitioner.[7]

---

[7] The Court of Appeals determined that Petitioner had abandoned his claim
about the photo array.

### 3. Analysis

The relevant dates for purposes of the Court's analysis are:

September 12, 2005 - the criminal incident;

October 21, 2005 - Burks identifies Petitioner in a photo array;

December 9, 2005 - Petitioner walks by Burks' cell in the detention area of the state district court and later calls out to Burks as Burks is being escorted out of the area; and

December 21, 2005 - Burks identifies Petitioner at a live line-up.

### a. The Line-up and Encounters at the Detention Facility

The Supreme Court held in Perry that "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." Perry, 132 S. Ct. at 730 (emphasis added); see also Howard v. Bouchard, 405 F.3d 459, 469-70 (6th Cir. 2005) (stating that "[u]nnecessary suggestiveness generally depends 'upon whether the witness's attention was directed to a suspect because of police conduct'") (quoting 2-5 Crim. Con. Law § 5.05(2)(b) (2004)) (emphasis added). Improper police action is a prerequisite to judicial checks on the reliability of an identification because "[a] primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances . . . is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place." Perry, 132 S. Ct. at 726. When there is an independent origin for the identifications of the defendant and significant other evidence connecting the defendant to the crime, an inadvertent confrontation between the defendant and a witness is not prejudicial. United States v. Monroe, 833 F.2d 95, 100-01 (6th Cir. 1987) (citing United States v.

12

Matlock, 491 F.2d 504, 505-06 (6th Cir. 1974)).

The record indicates that the police did not intend for Petitioner and Daniel Burks to meet on December 9, 2005, and that the encounters in the detention area of the state district court were inadvertent.  Furthermore, co-defendant Javon Sly's testimony at Petitioner's trial provided significant evidence connecting Petitioner to the crimes, and Burks had an independent basis for identifying Petitioner.  He observed Petitioner during the commission of crimes.  Burks also picked Petitioner out of a photo array prior to his encounters with Petitioner in the detention facility on December 9, 2005.  Thus, the inadvertent confrontations on December 9, 2005, were not prejudicial and did not render the live line-up on December 21, 2005, impermissibly suggestive.

### b.  The Photo Array

Petitioner maintains that Burks' identification of him at the showing of the photo array on October 21, 2005, was suggestive because the police informed Burks that Petitioner's photograph was in the array.  "[A]lthough the police generally should refrain from informing a witness that the suspect is in the lineup, a lineup is not unduly suggestive merely because they do so."  Jenkins v. New York, 478 F.3d 76, 93 (2d Cir. 2007) (citing Sales v. Harris, 675 F.2d 532, 538 (2d Cir. 1982)).  This is particularly true when the witness "immediately and unequivocally" identified the suspect in the array.  United States v. Porter, 29 F. App'x 232, 237 (6th Cir. 2002).

> Such [a] statement has some degree of suggestiveness and, depending upon the surrounding circumstances, may be a factor to be considered in determining whether the lineup was unduly suggestive.  It must be recognized, however, that any witness to a crime who is called upon to view a police lineup must realize that he would not be asked to

13

view the lineup if there were not some person there whom the authorities
suspected.  To ignore this fact is to underestimate average intelligence.
Thus, telling this to a witness may in many instances be relatively
harmless.

United States v. Gambrill, 449 F.2d 1148, 1151 n.3 (D.C. Cir. 1971).

Furthermore, the record does not support the contention that the police informed
Burks about Petitioner's photograph being in the photo array.  Sergeant Michael Russell
admitted at the evidentiary hearing that he told Burks there was someone in custody
who had revealed what happened and had given him information about the other
participants.  (Evidentiary Hr'g Tr., 10, Sept. 12, 2006.)  He nevertheless denied telling
Burks whom to pick out of the array.  He also denied suggesting to Burks that Petitioner
was a suspect and pictured in the array.  (Id.; Evidentiary Hr'g Tr., 132, Sept. 11, 2006.)
Sergeant Ernest Wilson assisted Sergeant Russell with the photo array, and he testified
at trial that he was "pretty sure" he did not tell Burks that the person he thought
assaulted Burks was in the array.  (Trial Tr. vol. V, 88-89, Dec. 13, 2006.)

Even if Burks was informed that Petitioner's photograph was in the array, it does
not appear that Burks was influenced by the remark.  He initially testified at the
evidentiary hearing that he was informed by the police that they had "the guy" in
custody, that the man told them what had happened, and that the man implicated
Petitioner and Gerald Hill in the crimes.  (Evidentiary Hr'g Tr., 113, Sept. 11, 2006.)
Burks subsequently changed his testimony somewhat.  He testified that he knew the
person who committed the crimes was in the array after he viewed it.  He claimed that
he knew the police had Javon Sly in custody, but he thought the police were still looking
for Sly's accomplices.  And even though he "kind of figured" the people who committed

14

the crimes were in the array, he was merely asked to pick out the person who had been

sitting in the front seat of the vehicle.  He personally identified the person.  No one  gave

him a suspect's name or told him whom to identify.  (Id. at 116-19, 122-25.)

The Court concludes from the record that the photo array was not impermissibly

suggestive.  Therefore, Petitioner's rights to due process and a fair trial were not

violated by evidence of Burks' identification of Petitioner in the photo array.

### c.  Independent Basis

Even if the pretrial identification procedures were unnecessarily suggestive, an

analysis of the Biggers factors indicates that there was an independent basis for Daniel

Burks' identification of Petitioner.

### i.  Opportunity to View the Suspect

The first Biggers factor is the witness's opportunity to view the suspect.  Burks

first saw Petitioner when the vehicle in which Petitioner was riding pulled up to Burks.

Burks claimed that Petitioner was seated in the front passenger seat, which was closest

to where Burks was standing.  Petitioner pointed a gun at Burks through the open

window and told him to get in the vehicle.

Although it was nighttime, there was a streetlight two houses down the street,

and a neighbor had a fluorescent light that enabled Burks to see what was happening.

(Id. at 94, 101.)  A neighbor who observed the incident from across the street was able

to see the model of the suspects' vehicle, the color of their weapons, and the light on

one suspect's cellular telephone.  (Trial Tr. vol. VI, 64, 79, 81, 121, Dec. 14, 2006.)

Given the lighting and the fact that Burks was in close proximity to Petitioner both

outside and inside the vehicle, it appears that he had a good opportunity to view

15

Petitioner.

### ii. Degree of Attention

The second <u>Biggers</u> factor is the witness's degree of attention.  This factor requires examining the circumstances surrounding the witness's encounter.  <u>Howard</u>, 405 F.3d at 473.  The Court may place greater trust in witness identifications made during the commission of a crime, as compared to that of a disinterested bystander or casual observer, because a victim has a reason to pay attention to the criminal.  <u>Id</u>.

The record indicates that, after Burks was forced into the suspects' vehicle, the person in the front passenger seat turned around, faced the center of the car where Burks was confined, and pointed a gun at Burks.  Burks did not close his eyes even though he was instructed to keep his head down and was being hit with a gun.  He was afraid, but he remained observant, and he was confined inside the vehicle for about five minutes.  (Evidentiary Hr'g Tr. 96-99, 127-28, Sept. 11, 2006.)  The stressful circumstances apparently motivated Burks to pay attention, and the facts indicate that he actually was attentive.

### iii. Accuracy of the Description

The third <u>Biggers</u> factor requires an examination of the accuracy of the witness's prior description of the defendant.  Burks did not describe Petitioner to the police immediately after the crime.  Consequently, there is no description to compare to Petitioner's actual appearance.

### iv. Level of Certainty

The fourth <u>Biggers</u> factor is the witness's level of certainty at the pretrial

16

identification.  At the photo array, Burks claimed that Petitioner was the person who had

been "calling the shots" from the front seat of the vehicle and was holding an AK-47.  At

the live line-up, he "immediately" identified Petitioner, and when Sergeant Michael

Russell asked Burks how he recognized Petitioner, Burks said that Petitioner was the

person in the front seat with the AK.  During a subsequent interview, Burks informed

Sergeant Matthew Gnatek that, although Petitioner had walked past his cell when the

two of them were detained in state district court, he recognized Petitioner from the

criminal incident on September 12, 2005.  The Court concludes from the speed with

which Burks identified Petitioner, his comment to Sergeant Gnatek, and the fact that he

was able to describe Petitioner's gun and role in the crime that he was certain of his

identification at the photo show-up and at the live line-up.

### v.  Length of Time

The fifth and final Biggers factor looks at the length of time between the initial

observation and the identification.  Thirty-nine days elapsed between the crime and the

showing of the photo array, and another two months elapsed before the live line-up

occurred.  A total of approximately three and a half months expired between the crime

and the live line-up.  Three months is not a great length of time between an observation

and identification," Howard, 405 F.3d at 473, and "[a] three to four-month delay between

the crime and the identification does not render the identification inherently unreliable."

United States v. Causey, 834 F.2d 1277, 1286 (6th Cir. 1987).

To summarize, Burks had a good opportunity to view Petitioner at the time of the

crime, and he was paying attention.  Although he did not provide the police with a

description of Petitioner, he was certain of his identifications, and the time between the

17

crimes and the identifications was not lengthy.  The Court therefore concludes that,

even if the pretrial identifications were impermissibly suggestive, there was an

independent basis for Burks' identifications, and the identifications were reliable.  The

trial court did not err in allowing the prosecution to elicit evidence about Daniel Burks'

pretrial identifications of Petitioner.  Nor did the court err in allowing Burks to make an

in-court identification.  Petitioner therefore has no right to relief on the basis of his first

claim.

**B.  The Prosecutor, Defense Counsel, and the Trial Court's Ruling**

Petitioner alleges that the prosecutor violated his right to due process by

vouching for Jovan Sly's credibility, by eliciting evidence that Petitioner was involved in

other assaultive crimes, and by asking improper questions.  Petitioner also contends

that his trial attorney was ineffective for failing to object to the prosecutor's vouching,

and the trial court abused its discretion when it denied his motion for a mistrial based on

the improper vouching.  The Michigan Court of Appeals stated on review of these claims

that the prosecutor's comments and questions were proper and that trial counsel was

not ineffective for failing to object to the comments and questions.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas

review."  Millender v. Adams, 376 F.3d 520, 528 (6th Cir. 2004) (citing Bowling v.

Parker, 344 F.3d 487, 512 (6th Cir. 2003)).  To prevail on a prosecutorial-misconduct

claim, a habeas petitioner must demonstrate that the prosecutor's conduct infected his

trial with such unfairness as to deprive him of due process.  Donnelly v. DeChristoforo,

416 U.S. 637, 643 (1974).  The misconduct must have been "so egregious as to render

the entire trial fundamentally unfair."  Cook v. Bordenkircher,  602 F.2d 117, 119 (6th

18

Cir. 1979). Federal courts in this Circuit

> apply a "two-part test to determine whether the state court reasonably applied the federal standard in holding that prosecutorial misconduct did not render [the petitioner's] trial fundamentally unfair." Irick v. Bell, 565 F.3d 315, 324 (6th Cir. 2009). [Courts] first determine whether the prosecution's conduct was improper. Id. Second, [courts] determine whether that improper conduct was flagrant by considering four factors: "(1) whether the evidence against the defendant was strong; (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally." Id. (internal quotation marks omitted).

Wogenstahl v. Mitchell, 668 F.3d 307, 328 (6th Cir.), cert. denied, __ U.S. __, 133 S. Ct. 311 (2012). For all the reasons set forth below, the Court concludes that the state court's adjudication of Petitioner's prosecutorial-misconduct claims was objectively reasonable and that none of Petitioner's claims about the prosecutor warrant habeas corpus relief.

**1. Eliciting the Terms of Sly's Plea Agreement** (habeas claim II)

Petitioner contends that the prosecutor vouched for co-defendant Jovan Sly's credibility by informing the jury in her opening statement that Sly was allowed to plead guilty to second-degree murder, assault with intent to murder, armed robbery, and felony firearm in exchange for Sly's "truthful testimony" against Petitioner. (Trial Tr. vol. II, 25, 30, Dec. 6, 2006.) The prosecutor elicited the same facts during her subsequent direct examination of Sly. (Trial Tr. vol. VII, 58, 77-78, Dec. 18, 2006.)

According to Petitioner, the prosecutor's comments and questions about Sly's plea agreement placed the prestige of the prosecutor's office behind Sly's testimony and implied that the prosecutor believed Sly's testimony was the truth. Petitioner further alleges that defense counsel was ineffective for failing to object to the alleged vouching.

19

The United States Court of Appeals for the Sixth Circuit explained in United

States v. Reid, 625 F.3d 977 (6th Cir. 2010), that

> "[i]mproper vouching occurs when a prosecutor supports the credibility of
> a witness by indicating a personal belief in the witness's credibility thereby
> placing the prestige of the [prosecutor] behind that witness." [United
> States v. Francis, 170 F.3d 546, 550 (6th Cir. 1999)].  This generally
> involves either blunt comments asserting personal belief, or comments
> that imply special knowledge of facts not before the jury or the credibility
> or truthfulness of the witness.  Id.

Id. at 982.

The prosecutor in this case did not indicate a personal belief in Sly's credibility,

nor imply that she had special knowledge about Sly.  In fact, she admitted that his

testimony must be viewed with caution because he participated in the crimes.

Moreover,

> it is not improper vouching for the prosecutor to refer to the plea
> agreements of cooperating witnesses in the expectation that their
> credibility will be at issue.  United States v. Owens, 426 F.3d 800, 806 (6th
> Cir. 2005).  Nor is it improper vouching to elicit testimony that the plea
> agreement contains a promise to testify truthfully.  Francis, 170 F.3d at
> 550.

Id. at 983.  The jury was entitled to know about any agreement or promises that the

prosecutor made with Sly in return for his testimony.  Giglio v. United States, 405 U.S.

150, 154-55 (1972); Carter v. Mitchell, 443 F.3d 517, 535 (6th Cir. 2006) (citing Giglio,

405 U.S. at 153-54, and Napue v. Illinois, 360 U.S. 264, 269 (1959)); see also Bell v.

Bell, 512 F.3d 223, 234 (6th Cir. 2008) (acknowledging "that the prosecution must

disclose a tacit agreement between the prosecution and a witness").

Although a co-defendant's guilty plea may not be used as substantive evidence

20

of a defendant's guilt, if the co-defendant testifies, the prosecution may elicit evidence of a guilty plea so that the jury may consider the evidence in assessing the co-defendant's credibility.  United States v. Blandford, 33 F.3d 685, 709 (6th Cir. 1994) (quoting United States v. Martinez-Nava, 838 F.2d 411, 416 (10th Cir. 1988)); United States v. Christian, 786 F.2d 203, 214 (6th Cir. 1986) (citing United States v. Halbert, 640 F.2d 1000, 1004 (9th Cir. 1981)).  And because the prosecutor did not imply that she was in a special position to ascertain whether Sly was, in fact, testifying truthfully, the prosecutor's comments and questions about Sly's plea agreement were proper.

The remaining question is whether defense counsel was ineffective for failing to object to the prosecutor's statement and questions about Sly's plea agreement.  To prevail on this claim, Petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced the defense.  Strickland v. Washington, 466 U.S. 668, 687 (1984).

Because the prosecutor's comments and questions about Sly's plea agreement were proper, defense counsel's failure to object to the prosecutor's conduct did not constitute deficient performance.  A trial attorney is not ineffective for failing to make a meritless objection.  Hoffner v. Bradshaw, 622 F.3d 487, 509 (6th Cir. 2010), cert. denied, __ U.S. __, 131 S. Ct. 2117 (2011); United States v. Martin, 45 F. App'x 378, 381 (6th Cir. 2002).

### 2.  Eliciting Evidence of Other Crimes (habeas claim IV)

Petitioner asserts that the prosecutor engaged in additional misconduct by eliciting testimony that he was involved in other, unrelated assaultive crimes.  This claim arose during the prosecutor's questions to Javon Sly regarding how he met Petitioner.

21

Sly testified that Petitioner was a friend of the family and that they did things together. The prosecutor then asked Sly whether it was usual or unusual when Petitioner called Sly and informed him that he had a "lick" (robbery). Sly replied, "It would be usual." (Trial Tr. vol. VII, 17, Dec. 18, 2006.) Although defense counsel moved for a mistrial on the ground that the prosecutor had violated a court order not to introduce evidence of Petitioner's other "bad acts," the trial court denied his motion. (Id. at 18-26.)

Petitioner asserts that the prosecutor's question was prohibited by the Michigan Rules of Evidence and that Sly's response could have led the jury to conclude, that because he was guilty of other "bad acts," he must be guilty of the crime for which he was being tried. Petitioner also contends that the trial court abused its discretion by denying his motion for a mistrial. The Michigan Court of Appeals determined that the prosecutor's question did not amount to misconduct and that, any minimal prejudice was cured by the trial court's jury instruction to disregard the question and answer.

This Court finds no merit in Petitioner's claim because the "admission of evidence in state trials is ordinarily governed by state law, and the reliability of relevant testimony typically falls within the province of the jury to determine." Perry, 132 S. Ct. at 720. Further,

> [t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence . . . . While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, see Old Chief v. United States, 519 U.S. 172, 117 S. Ct. 644, 136 L. Ed.2d 574 (1997); Huddleston v. United States, 485 U.S. 681, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988), it has not explicitly addressed the issue in constitutional terms.

Bugh v. Mitchell, 329 F.3d 496, 512-13 (6th Cir. 2003); see also Bey v. Bagley, 500

F.3d 514, 523 (6th Cir. 2007) (concluding that the petitioner's disagreement with the state court's ruling on "other acts" evidence involved no constitutional dimension and, therefore, was not cognizable on federal habeas review).  As no Supreme Court decision bars the use of propensity evidence on constitutional grounds, the state appellate court's denial of Petitioner's claim was not contrary to Supreme Court precedent.

Even if Petitioner's claim were cognizable on habeas review, the Michigan Court of Appeals determined that the prosecutor's question was relevant to establishing the nature of the relationship between Petitioner and Jovan Sly.  Furthermore, the trial court sustained defense counsel's objections and instructed the jurors to disregard the prosecutor's question.  (Trial Tr. vol. VII, 29, Dec. 18, 2006.)  Because "juries are presumed to follow their instructions," Richardson v. Marsh, 481 U.S. 200,  211 (1987), the alleged error did not deprive Petitioner of a fair trial.

### 3.  The Prosecutor's Leading Questions (habeas claim V)

Petitioner claims that the prosecutor repeatedly asked leading questions and questions that were designed to elicit inadmissible hearsay and speculative responses. Petitioner also faults the prosecutor for referring to her undisclosed notes about an interview with a witness and for insinuating that Petitioner made a custodial statement to the police and that prosecution witness David Jose gave a statement to the FBI. Petitioner claims that the trial court erred by denying his motion for a mistrial because, in his opinion, the prosecutor's questions amounted to flagrant misconduct, which likely influenced the jury's decision about whom to believe.

The Michigan Court of Appeals found no indication in the record that the

23

prosecutor was motivated by an improper purpose.  The Court of Appeals also stated

that any prejudice was insignificant and that the trial court's jury instructions were

sufficient to dispel that prejudice.

This Court likewise finds no merit in Petitioner's claim.  The contention that the

prosecutor asked leading questions "relates to a state rule of evidence, and federal

habeas review of state court evidentiary rulings is extremely limited."  Jordan v. Hurley,

397 F.3d 360, 362 (6th Cir. 2005) (citing Waters v. Kassulke, 916 F.2d 329, 335 (6th

Cir. 1990)).

> [A] state court's erroneous application of state law is only ground for
> habeas relief if the application also violates federal law.  Coleman v.
> Mitchell, 244 F.3d 533, 542 (6th Cir. 2001).  Such a violation occurs only if
> the "evidentiary ruling is so egregious that it results in a denial of
> fundamental fairness."  Bugh v. Mitchell, 329 F.3d 496, 512 (6th Cir.
> 2003); see Washington v. Hofbauer, 228 F.3d 689, 699 (6th Cir. 2000).

Jackson v. Bradshaw, 681 F.3d 753, 763 (6th Cir. 2012), cert. denied sub nom Jackson

v. Robinson, __ S. Ct. __, No. 12-6880, 2013 WL 215613 (U. S. Jan. 22, 2013).

As Petitioner himself points out, the trial court sustained many of defense

counsel's objections to the prosecutor's leading questions and attempts to elicit hearsay

testimony from David Jose.  (Trial Tr. vol. VIII, 99, 101, 106, Dec. 19, 2006; Trial Tr. IX,

14, 20, 22, 27, Dec. 20, 2006.)  And the prosecutor made only a brief reference to the

notes that she made of Mr. Jose's oral interview with Sergeant Russell.  Furthermore,

when defense counsel objected, the trial court instructed the jury to disregard the

question about the interview.  (Trial Tr. vol. IX, 28-29, Dec. 20, 2006.)

As for the reference to custodial statements, Petitioner is mistaken in thinking

that the prosecutor was inquiring about a statement which he made.  Mr. Jose testified

that Petitioner had tried to encourage Jovan Sly and Gerald Hill to get <u>their</u> statements suppressed.  (<u>Id.</u> at 18, 20.)

The evidence against Petitioner was overwhelming, moreover, and the trial court instructed Petitioner's jury that the attorneys' statements and questions were not evidence.  The court also stated that the jurors should consider only the admissible evidence when making their decision.  (Trial Tr. vol. XVI, 136-37, Jan. 23, 2007.)

For all these reasons, the Court concludes that the prosecutor's leading and allegedly improper questions did not deprive Petitioner of a fair trial.  The Michigan Court of Appeals reasonably concluded that the trial court did not abuse its discretion when denying defense counsel's motion for a mistrial.

## C.  The Trial Court's Comments (habeas claim III)

Petitioner alleges that the trial court deprived him of a fair trial by demeaning and belittling defense counsel in front of the jury during defense counsel's cross-examination of Daniel Burks.  The Michigan Court of Appeals determined that the trial court's remarks were well within its discretion to control the proceedings and did not prejudice Petitioner.

### 1.  Legal Framework

A trial judge "is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law."  <u>Quercia v. United States</u>, 289 U.S. 466, 469 (1933) (citing <u>Herron v. Southern Pacific Co</u>., 283 U.S. 91, 95 (1931)).  "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not

25

support a bias or partiality challenge." <u>Liteky v. United States</u>, 510 U.S. 540, 555

(1994).

> "Judicial misconduct is found where the judge's remarks clearly
> indicate a hostility to one of the parties, or an unwarranted prejudgment of
> the merits of the case, or an alignment on the part of the Court with one of
> the parties." <u>United States v. Blood</u>, 435 F.3d 612, 629 (6th Cir. 2006)
> (citations and internal quotation marks omitted).  Even sarcastic
> comments which "could have been phrased more diplomatically" do not
> amount to misconduct when they "primarily evidence the judge's effort to
> seek additional information from witnesses and not any prejudice or bias."
> <u>Id</u>.; <u>see</u> <u>United States v. Powers</u>, 500 F.3d 500, 511 (6th Cir. 2007) ("A
> trial court judge . . . may interject himself into the trial, speak to counsel,
> and question witnesses in order to clear up confusion regarding the
> evidence or aid in its orderly presentation.").

<u>United States v. Ross</u>, __ F.3d __, __, Nos. 09-1852 and 09-1860, 2012 WL 6734087,

at *14 (6th Cir.  Dec. 31,  2012).

## 2.  Application

The alleged judicial misconduct in this case occurred during defense counsel's

cross-examination of Daniel Burks, the complaining witness.  Defense counsel

attempted to impeach Burks with his prior testimony at the preliminary examination and

at an evidentiary hearing.  At one point during the cross-examination, the trial court

interrupted defense counsel to say, "Wait a minute.  That's not the proper way."  (Trial

Tr. vol. III, 83, Dec. 7, 2006.)  A short time later, the trial court said, "Hold it.  Hold it.

You're testifying now. . . . – that's argumentative."  (<u>Id</u>. at 94.)  And when defense

counsel directed Burks' attention to a question in the transcript of the preliminary

examination, the trial court said, "Hold it.  Hold it.  See, you've got it open to the page

and you then jump to it.  I've got to find the page so I can follow it, Counsel . . . .  What

page are you on?"  (<u>Id</u>. at 97-98.)  Subsequently, defense counsel asked Burks whether

he could recall saying at the evidentiary hearing that he was "under the influence." Before Burks could answer, the trial court said, "Hold it.  Hold it.  You've got to go to specific questions and specific answers.  You can't ask a question like that to try to impeach him . . . .   That's not the proper way to do it, Counsel."  (Id. at 101-02.)

The interruptions continued with the trial court pointing out that defense counsel was misreading the transcripts (id. at 103), not citing to the page and line of the transcript (id. at 125-26), repeating questions (id. at 150) or not phrasing a question properly and reaching a conclusion as to the answer (id. at 128-30, 134, 144-46).  The court admonished defense counsel to "move on" and not "just stand up and read the whole transcript."  (Id. at 105, 125, and 150.)

Petitioner claims that the trial court's comments interfered with his attorney's trial strategy and created a negative impression of defense counsel in the jurors' minds. Petitioner also contends that the trial court's comments invited the jury to take the same attitude toward defense counsel as the court did and to view defense counsel as aggressive and aggravating.  At the same time, argues Petitioner, the interruptions and comments served to bolster Daniel Burks' stature and credibility and to discourage the jury from evaluating Burks' testimony with a discerning eye.

While it is true that the trial court interrupted defense counsel many times during his cross-examination of Burks, the court did not prevent defense counsel from presenting his theory of the case.  Nor did he show favoritism to the prosecution, and "the sheer volume of injections . . . is not enough to constitute reversible error."  Powers, 500 F.3d at 513.  The trial court explained to counsel on the following day that its interruptions were necessary to ensure that the proper procedures and rules of

27

evidence were followed.  (Trial Tr. vol. IV, 14, Dec. 11, 2006.)  A trial court's

interruptions are appropriate and warranted when, as here, the court is properly carrying

out its duty to prevent improprieties or to clarify the record and when the record shows

impartiality in admonishments and rulings.  United States v. Warner, 971 F.2d 1189,

1197-98 (6th Cir. 1992).

Furthermore, it was a contentious and lengthy trial (nineteen days) with

numerous objections by the defense attorneys and prosecutor throughout the

proceedings.  Although "[o]utright bias or belittling of counsel is ordinarily reversible

error," "intervention by the judge is often needed to clarify what is going on" in a lengthy,

complex trial.  United States v. Hickman, 592 F.2d 931, 933 (6th Cir. 1979).

The trial court's disputed comments in this case occurred on the third day of trial.

In subsequent days, the trial court sustained many of defense counsel's objections to

the prosecutor's case and overruled many of the prosecutor's objections to defense

counsel's conduct.  The trial court also admonished the prosecutor at times.  Through it

all, the trial court remained fair and impartial while attempting to run an orderly

courtroom.

This is not a case where the trial court sua sponte assisted the prosecution, took

over defense counsel's cross-examination of witnesses, stated or implied its disapproval

of the defense theory, called defense counsel insulting names, and generally made a

fair trial impossible.  Cf. Lyell v. Renico, 470 F.3d 1177, 1187 (6th Cir. 2006).  Moreover,

at the close of the case, the trial court charged the jurors not to let sympathy or

prejudice influence their decision.  (Trial Tr. vol. XVI, 133, Jan. 23, 2007.)  The court

also instructed the jurors that its comments, rulings, questions, and instructions were

28

not evidence.  The court explained that it was the court's duty to conduct the trial according to the law and that, when it made a comment or gave an instruction, it was not trying to influence the jury's vote or express a personal opinion about the case.  The court also said that, if the jurors believed that the court had an opinion about how to decide the case, they must pay no attention to that opinion, because the jurors were the only judges of the facts and they should decide the case on the evidence.  (Id. at 136.) Whatever negative impact the trial court's conduct may have had on the jury was mitigated by these instructions.  Powers, 500 F.3d at 514 (citing United States v. Johnson, 182 F. App'x. 423, 434 (6th Cir. 2006)).

The Court concludes that Petitioner's defense was not hampered in any material way by the trial court's interruptions during defense counsel's cross-examination of Daniel Burks.  Consequently, Petitioner is not entitled to relief on the basis of his claim about the trial court's conduct.

### D.  Co-Defendant Hill's Testimony (habeas claim VI)

Petitioner states that he was denied his constitutional right to a fair trial when the trial judge permitted co-defendant Hill to testify before Petitioner's jury.  (Trial Tr. vol. XI, 116, Jan. 16, 2007.)  Although the two men had separate juries, Hill decided to testify in his own defense, and the prosecutor endorsed him as a witness.  Hill then testified before both juries and denied being involved in the crimes for which he and Petitioner were being tried.  (Trial Tr. vol. XII, 44-45, Jan. 17, 2007.)

On cross-examination, however, the prosecutor impeached Hill with his pretrial statement to the police in which he stated that Petitioner planned and participated in the robbery and shot one victim in the head.  (Id. at 138-43;Trial Tr. vol. XIII, 17, 33-34, Jan.

18, 2007.)  Petitioner claims that Hill's testimony eviscerated his defense and that the

trial court deprived him of due process of law by failing to completely sever his and Hill's

trials.

The Michigan Court of Appeals thoroughly addressed this issue and concluded

that the trial court did not err when it permitted Hill to testify in front of Petitioner's jury.

The Court of Appeals stated that the prosecution was entitled to call Hill to testify

against Petitioner after Hill waived his Fifth Amendment rights and that any spillover

effect occasioned by Hill's testimony did not warrant further severance and did not

prejudice Petitioner's trial.

### 1.  Legal Framework

Joint trials are favored.  Van v. Jones, 475 F.3d 292, 314 (6th Cir. 2007);

Stanford v. Parker, 266 F.3d 442, 459 (6th Cir. 2001), and joinder was appropriate in

this case because Petitioner and Hill were charged with the same crimes arising out of

the same incident.  The question is whether complete severance was necessary.

In the federal system, severance is necessary "only if there is a serious risk that

a joint trial would compromise a specific trial right of one of the defendants, or prevent

the jury from making a reliable judgment about guilt or innocence."  Zafiro v. United

States, 506 U.S. 534, 539 (1993).  But Zafiro involved the interpretation of the Federal

Rules of Criminal Procedure, not the United States Constitution, and therefore it "has no

precedential weight in reviewing state court proceedings on due process grounds . . . ."

Phillips v. Million, 374 F.3d 395, 398 (6th Cir. 2004).

Severance is governed by state law, and "[s]tate-law trial errors will not warrant

habeas relief unless the 'error rises to the level of depriving the defendant of

30

fundamental fairness in the trial process.'" Hutchison v. Bell, 303 F.3d 720, 731 (6th

Cir. 2002) (citing Serra v. Michigan Dep't of Corr., 4 F.3d 1348, 1354 (6th Cir. 1993)).

"[F]ailure to sever can rise to the level of a constitutional violation when 'essential

exculpatory evidence that would be available to a defendant tried alone [is] unavailable

in a joint trial.'" Id. at 731-32 (quoting Zafiro, 506 U.S. at 539) (citing Tifford v.

Wainwright, 588 F.2d 954 (5th Cir.1979)).  But "[g]ranting or denying severance is within

the trial judge's discretion.  See Glinsey v. Parker, 491 F.2d 337, 343 (6th Cir. 1974).

And, a state trial court's alleged abuse of discretion, without more, is not a constitutional

violation.  See Sinistaj v. Burt, 66 F.3d 804, 805, 808 (6th Cir. 1995)."

Sanford, 266 F.3d at 459.

### 2. Application

Petitioner alleges that Hill testified in order to shift blame to him, but the record

reveals that their defenses were not antagonistic and that Hill did not shift blame for the

crimes on Petitioner.  Hill testified that he was at home watching football on television

with his girlfriend and children on the night of the crimes.  He denied committing the

crimes or aiding and abetting anyone else in committing the crimes, and he claimed

that, although he signed a written statement to the police, the statement was not the

truth.  He maintained that he signed the statement because Sergeant Russell promised

him a variety of things.  He also testified that, even though the police wanted him to

testify against Petitioner, he did not know Petitioner and could not send a man whom he

did not know to prison.  (Trial Tr. vol. XII, 44-48, Jan. 17, 2007.)  When the prosecutor

asked Hill whether he implicated Petitioner in his statement to the police, Hill said, "No."

He claimed that Sergeant Russell wrote the incriminating remarks.  (Trial Tr. vol. XIII,

31

10, Jan. 18, 2007.)

Hill's testimony was consistent with Petitioner's defense that he, too, was elsewhere at the time of the crimes and was not involved in them.  Petitioner was not deprived of a viable defense by his joint trial with Hill, and he was not entitled to a separate trial simply because he might have had a better chance of acquittal if he had been tried alone.  Ross v. United States, 339 F.3d 483, 493 (6th Cir. 2003) (quoting United States v. Breinig, 70 F.3d 850, 853 (6th Cir. 1995)).

Furthermore, Hill's statement was not admitted in evidence in Petitioner's case, and the trial court charged the jurors not to use the statement against Petitioner.  The court then repeated, "You must not consider that statement in any way when you decide whether Kehinde Wofford is guilty or not guilty."  (Trial Tr. vol. XVI, 140, Jan. 23, 2007).[8] The trial court also informed the jurors that the attorneys' questions were not evidence and that the joint trial was not evidence that Petitioner and Hill were associated with each other or that either one was guilty.  (Id. at 136, 139.)  "Juries are presumed to be capable of following instructions . . . regarding the sorting of evidence and the separate consideration of multiple defendants."  United States v. Walls, 293 F.3d 959, 966 (6th Cir. 2002) (citing Zafiro, 506 U.S. at 540-41); see also Sanford, 266 F.3d at 459 ("Jurors are presumed to follow the instructions of the court and to give each defendant's case separate consideration.")

_____

[8] During deliberations, the jurors sent a note to the trial court asking how much of Hill's testimony they could use in their decision-making.  The trial court gave a supplemental jury instruction stating that the jurors could consider as much of Hill's testimony as they wanted (Trial Tr. vol. XVII, 59, Jan. 24, 2007), but Hill's written statement to the police was not admitted as an exhibit in Petitioner's case.

32

In addition, the Michigan Court of Appeals correctly recognized that Petitioner's right of confrontation was not violated by Hill's testimony.  Hill was available for cross-examination or as a witness in Petitioner's case.  See Crawford v. Washington, 541 U.S. 36, 59 n.9 (2004) (explaining that, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements"); see also Peak v. Webb, 673 F.3d 465, 473-74 (6th Cir. 2012) (finding it reasonable for the state courts to believe "that confrontation only requires that a declarant be made available in the courtroom for a criminal defendant to call during his own case"), cert. denied, __ S. Ct. __, Nos. 12-6382 and 12A52 (U.S. Jan. 14, 2013.)

For all these reasons, the trial court did not deprive Petitioner of a fair trial when it permitted Hill to testify before Petitioner's jury.  Petitioner therefore has no right to relief on the basis of his sixth claim.

**E.  Cumulative Effect of Errors** (habeas claim VII)

Petitioner's seventh and final claim alleges that the cumulative effect of the errors in his case, including the tainted lineup, improper vouching, trial court's comments, prosecutorial misconduct, and co-defendant Hill's testimony, deprived him of his right to due process of law.  Petitioner maintains that the errors cannot be considered harmless and,  therefore, his convictions must be reversed.  The Michigan Court of Appeals stated that many of the claimed errors were not errors, and to the extent there were errors, the errors were not so prejudicial that they deprived Petitioner of a fair trial.

This Court rejects Petitioner's claim because a claim that the cumulative effect of errors rendered a petitioner's trial fundamentally unfair is not cognizable on habeas

33

review.  Sheppard v. Bagley, 657 F.3d 338, 348 (6th Cir. 2011) (citing Moore v. Parker,

425 F.3d 250, 256 (6th Cir. 2005)), cert. denied sub nom Sheppard v. Robinson, __

U.S. __, 132 S. Ct. 2751 (2012).  Petitioner therefore has no right to relief on the basis

of his claim about the cumulative effect of trial errors.

## V.  CONCLUSION

The state appellate court's decision was not contrary to clearly established

Supreme Court precedent, an unreasonable application of clearly established Supreme

Court precedent, or an unreasonable determination of the facts.  Consequently,

Petitioner has no right to habeas corpus relief, and his petition is denied.

## VI.  CERTIFICATE OF APPEALABILITY

Before Petitioner may appeal this decision, a certificate of appealability must

issue.  28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1).  A certificate of appealability

may issue "only if the applicant has made a substantial showing of the denial of a

constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by

demonstrating that jurists of reason could disagree with the district court's resolution of

his constitutional claims or that jurists could conclude the issues presented are

adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S.

322, 327 (2003).

Reasonable jurists would not find the Court's assessment of Petitioner's

constitutional claims debatable or wrong.  The Court therefore declines to grant a

certificate of appealability.  Petitioner nevertheless may proceed in forma pauperis on

appeal because an appeal could be taken in good faith.  28 U.S.C. § 1915(a)(3).

34

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

Dated: January 31, 2013

## CERTIFICATE OF SERVICE

I hereby certify that on the above date a copy of this Opinion and Order was served upon the Petitioner via ordinary U.S. Mail, and Counsel for the Respondent, electronically.

s/Bernadette M. Thebolt
Case Manager

35